59773. FULTON NATIONAL BANK v. WILLIS DENNEY FORD, INC. et al.

CARLEY, Judge:

In 1966 appellant-Fulton National Bank (Bank) entered into a loan agreement with appellee-Willis Denney Ford, Inc. (WDF). The agreement contemplated the financing of WDF's automobile inventory through a floor plan arrangement. WDF purchased automobiles from Ford Motor Company. When an automobile was delivered to WDF, Ford presented a sight draft to the Bank for payment. The Bank paid the sight draft and WDF in turn executed a demand promissory note in that amount to the Bank and a security agreement in favor of the Bank covering the automobile. When WDF sold the automobile, it was required to pay the Bank the amount due on the demand note which had been executed in connection with its acquisition from the manufacturer. Upon payment by WDF, the Bank cancelled the demand note and the security agreement covering the sold automobile. Under the agreement, the only demand notes and security agreements outstanding at any time should have been those executed by WDF in connection with automobiles as yet unsold or which had been sold within the past day or so.

In connection with the floor plan arrangement, the Bank conducted periodic floor plan audits of WDF's inventory to confirm that WDF still had possession of each automobile covered by the outstanding demand notes and security agreements held by the Bank. In March of 1974, in the course of such an audit, the Bank discovered that WDF had sold 56 automobiles without satisfying the

demand notes which covered them. WDF was "out of trust" by more than $180,000. When the Bank informed appellee-Denney, president of WDF, he denied any knowledge of his company's "out of trust" status. Denney's wife, WDF's bookkeeper, admitted being aware of the situation since November of 1973 and it was determined that the funds which should have been paid to the Bank were used for other purposes.

Because of WDF's breach of the agreement, two of the Bank's officers met with Denney and informed him that termination of the agreement by calling all the demand notes was contemplated. Denney replied that he was reasonably certain WDF could arrange financing through Ford Motor Credit Company. However, within two weeks WDF paid to the Bank the full amount by which it was "out of trust" and the remaining notes were not demanded at that time.

In order to prevent another "out of trust" situation, the Bank stationed an employee on WDF's premises to ensure that it was paid for each automobile sold which was financed under the floor plan arrangement. The Bank also conducted an examination of WDF's books and records to determine how WDF had gotten "out of trust." This examination revealed improper record entries, questionable tax deductions, use of corporate funds for personal expenses, payment of salaries deemed "excessive" to Denney's relatives who were employed by WDF, and a significant drop in car sales from November 1973 to February 1974. An officer of the Bank met with Denney during March and April of 1974 to discuss proposed changes in WDF's operating procedures designed to avoid another "out of trust" situation. Denney refused to agree to the proposals. The Bank tried unsuccessfully again in May to obtain WDF's agreement to the proposed changes. In July of 1974 WDF requested that the Bank finance 75 new automobiles under the floor plan arrangement. The Bank refused to authorize financing for the new cars and on July 24, 1974, gave WDF written notice of its demand for immediate payment of all outstanding demand notes and advised that "[a] bank representative will be placed on your premises until such indebtedness is satisfied." When WDF failed to pay the notes on demand, the Bank did not exercise its right to repossess the automobiles under the security agreements but, rather, agreed to work with WDF for the sixty days required for a certified audit of the company's books so that WDF could secure a financing arrangement through Ford Motor Credit Company. On October 8, 1974, WDF and the Bank entered into an agreement whereby payment on the notes was further extended until January 10, 1975. Before that date WDF secured another floor plan arrangement financed through Ford Motor Credit Company and

satisfied the entire amount of the indebtedness owing to the Bank on the demand notes.

In 1976 WDF and Denney, in his individual capacity, filed the instant action against the Bank. The multi-count complaint sought recovery of damages alleged to have been the result of the actions the Bank had taken in terminating its credit relationship with WDF. After discovery the Bank moved for summary judgment and in support thereof urged that in terminating the credit relationship it was exercising its incontestable right as the holder of demand notes to call for their payment and that such action could not, therefore, be a viable basis for suit against it. WDF opposed the motion by urging that there remained a genuine issue of material fact as to the Bank's "good faith" in terminating the credit relationship by calling the demand notes. The trial court denied the Bank's summary judgment motion but certified this ruling for immediate review. The Bank's application to this court for an interlocutory appeal from the denial of its motion was granted in order that we might review the applicability of "good faith" to the underlying circumstances of the case at bar.

The sole issue presented for resolution is whether the decision by the holder of a demand instrument to demand payment must be made in "good faith" so that such decision can subsequently be attacked by the obligor as having been made, under the circumstances, in "bad faith." We note at the outset the inapplicability of the "good faith" requirement of Code Ann. § 109A-1 —208 to this issue. That statute provides, in pertinent part: "A term providing that one party or his successor in interest may *accelerate payment or performance* or require collateral or additional collateral 'at will' or 'when he deems himself insecure' or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired." (Emphasis supplied.) "Obviously this section has no application to demand instruments or obligations whose very nature permits call at any time with or without reason. This section applies only to an agreement or to paper which in the first instance is payable at a future date." 1 Anderson, Uniform Commercial Code 187, § 1-208:2 (1970 2d Ed.). Therefore, WDF's reliance upon *Ginn v. C. & S. Nat. Bank,* 145 Ga. App. 175 (243 SE2d 528) (1978), which holds that "good faith" was a question of fact under Code Ann. § 109A-1—208, is misplaced. *Ginn* has no application here where the issue is the Bank's call of demand instruments.

WDF strongly relies upon Code Ann. § 109A-1—203: "Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." This Code section "in effect states

that what is not regulated by the contract should be done in such a way as to show good faith in the carrying out of what is expressed." 1 Anderson, Uniform Commercial Code 165, § 1-203:3 (1970 2d Ed.). What WDF fails to consider in this argument is that the due date on demand instruments is "regulated by the contract." A demand instrument is due immediately. *Icard v. Harbuck,* 137 Ga. App. 570 (224 SE2d 532) (1976). "A note payable on demand is due immediately after delivery, without further notice or demand. Suit may be brought on demand paper without making any independent demand." 2 Anderson, Uniform Commercial Code 645, 646, § 3-108:3 (1971 2d Ed.). "A cause of action against a maker or an acceptor accrues in the case of a demand instrument upon its date or, if no date is stated, on the date of issue." Code Ann. § 109A-3—122 (1) (b). Thus, the only "duty" under the U. C. C. on a holder of a demand instrument is to seek enforcement of the instrument which is on its face "immediately" due and payable within the applicable statute of limitation. There is no reason why the obligor on an "immediately" due and payable instrument should be entitled to contest the holder's decision to enforce payment any time within the statute of limitation as being in "bad faith." The obligor, by his signature, has agreed that his obligation is on its face "immediately" due and payable and is subject to no other contingencies. Qualifying that obligation by requiring that the holder demonstrate his "good faith" in seeking payment can have no beneficial result for either the holders or makers of demand instruments. As noted, a demand instrument by its "very nature permits call at anytime with or without reason." Interference with that commercial "nature" of demand notes is to be avoided. The Bank has demonstrated on summary judgment that the basis for WDF's suit is the enforcement of demand notes. In seeking enforcement of those demand notes the Bank was carrying out what was regulated by the instruments — immediate payment. While WDF contends that summary judgment for the Bank should be denied because there remains a genuine issue as to the Bank's "good faith" in seeking payment on the demand notes, the Bank's "good faith" or lack thereof in seeking payment on these demands instruments is not a genuine issue of "material fact." It was, therefore, error to deny the Bank's motion for summary judgment.

*Judgment reversed. Quillian, P. J., and Shulman, J., concur.*

ARGUED APRIL 10, 1980 — DECIDED JUNE 12, 1980 —

*Robert E. Shields, Richard R. Cheatham, Lawrence J. Hogan,*

for appellant.

*Frank C. Bedinger, III, Alan F. Herman,* for appellees.